Alexander Del Giorno, J.
This is a claim for permanent appropriation on October 18, 1956 of some five feet of land in front of claimants’ property along the south side of new State Route 17B, known as the Monticello-Mongaup Valley State Highway No. 890. According to the contract plans drawn for the widening of Route 17B, and also according to the map served upon the claimants by the State, the State’s right of way consisted of a three-rod width including pavement and shoulders. The whole project was finished upon such an assumption of the highway width by the State.
At the trial it developed that the State now claims its right of way to be six rods wide, although it had already paid some adjoining owners for land taken based upon the three-rod width.
The District Engineer, who said he had charge of the contract plans, stated that the plans were obviously drawn in error, as he proved to himself in preparation for this trial by a re-examination of the ancient records and the original construction plans for the same road made by the State in 1911.
The present Route 17B was formerly known as the Cochecton-Newburgh Turnpike. This turnpike came about as a result of the passage by the State Legislature of chapter 36 of the Laws of 1801, which provided for the establishment of said turnpike. At that time, Ulster County included also what is now known as Sullivan County.
Chapter 36 of the Laws of 1801 created a corporation for the establishment of a turnpike for improving and making a road from Newburgh to Cochecton. It provided for the appointment of three Commissioners who were to sell shares and provide for the condemnation and purchase of land required, but were not authorized to “ enter such lands and thereon make the said road until they shall have paid or tendered the value of such land together with such damages as may be agreed upon or appraised according to the provisions of this act * * * The President and directors * * * shall cause a road to be laid out not less than 4 rods and not exceeding 6 rods, 16 feet of which shall be bedded, etc., which after completion upon inspection will be licensed by the Governor.”
Pursuant to the statute, Commissioners were appointed to determine the amount of land required and to assess damages *132 by way of an inquisition. Seemingly, this was all done. To the majority of owners, especially nonresident owners, no damages were awarded, the Commissioners asserting, “ So and so has sustained no damages by reason of said road running across his land.” The other property owners were awarded damages from $2 up to $30. No reasons were advanced why so many owners were awarded no damages.
It may be noted here that the Commissioners were appointed to estimate and assess the damages ‘ ‘ without favor or partiality ”.
Survey notes are attached to the inquisition. These are most difficult to follow, but the State’s expert witnesses, who were the only ones to testify regarding the survey, to justify the claim of the State, indicated that generally, east of Monticello the turnpike was to be established as four rods wide and west of Monticello as six rods wide. The lands of the claimants are located west of Monticello and would be affected by the six rods width.
In 1809, the present Sullivan County came into existence. On September 3, 1872, by resolution, the Town of Thompson in Sullivan County established new road districts for the portion of the turnpike lying within its border, which resolution read in part: “Whereas the Newburgh and Cochecton Turnpike Company (a part of whose roadbed runs through said Town) having abandoned the same, I, Caleb Gr. Decker, Commissioner of Highways * * * do district the said road as follows.”
How, whether or when the turnpike was opened, was operated or was abandoned, the record does not indicate. Nor was there any proof of the turnpike having been approved and licensed by the G-overnor, as provided in the original statute.
However, by chapter 526 of the Laws of 1873, the Legislature incorporated the Monticello-White Lakes Turnpike Company “ to take possession of that part of the abandoned turnpike road which lies between Monticello and the road leading from White Lake to Black Lake, and which, before such abandonment, was part of the Newburgh and Cochecton turnpike road; provided, that the consent in writing of the commissioners of highways of the respective towns of Thompson and Bethel shall first be obtained and filed in the office of the county clerk of Sullivan county ”. No such consent was produced at the trial.
By chapter 102 of the Laws of 1898 the Legislature authorized the Newburgh and Cochecton Turnpike Company to abandon and discontinue its turnpike from the westerly line of the City, of Newburgh to the bridge over the Wallkill River in the Town *133 of Montgomery, provided it revert to the several villages and towns through which it passed and be made a public highway.
By chapter 315 of the Laws of 1906 the Legislature authorized the Towns of Thompson, Bethel, etc., to acquire by purchase or condemnation turnpikes and make them into public highways.
On December 30,1911, the State took over and, it seems, paved the Monticello-Mongaup Valley Road which later became Route 17B. The meager record indicates that the paved roadway was 14 feet wide, and the plans of the State indicated then its width to be three rods and four rods, the testimony being somewhat nebulous as to whether it was three or four rods along the claimants’ property.
In the year 1955, the State drew plans for the reconstruction of Route 17B as it appears today. The contract plans of 1955 and the appropriation maps served on the various owners along its route indicate 17B to be a three-rod road. The appropriation map attached to the filed claim is in evidence and is marked State’s Exhibit Y.
The State vested title on July 24,1957, pursuant to the appropriation map. Thereafter, the State concededly paid some of the property owners for taking their frontage on the basis of a three-rod road.
The testimony dealing with ancient records was necessarily complicated, and the engineers themselves had to do a great deal of guessing and assuming to try to sustain the State’s contention. The State presented Mr. Johnson, the District Engineer, and Mr. Shumaker, an engineer of repute who was hired by the State in the year 1960, after 17B had been completed, to determine in 1960 the width of 17B in 1807. The court was impressed with the spirit of fairness as well as the ability of both these gentlemen. They, too, had their difficulties in reaching their conclusions that the center line of 17B was about the same as the center line of the original turnpike.
The court was told that the original survey was concerned only with the center line of the proposed turnpike. The court accepts the engineer’s mapping of the original survey notes which are reflected in State’s Exhibits TT and TJU made by Mr. Shumaker on a scale where 1 foot equaled 500 feet and where 1 foot equaled 400 feet respectively.
The State’s aerial map taken on a scale where 1 foot equaled 400 feet was taken after 17B had been completed.
No testimony was adduced to contradict the establishment of the center line from the survey notes. However, it was not until 1911 that the width of the road was first projected. Then *134 the State took over the route and also condemned some properties on the basis of contract plans indicating it owned a 50-foot width in some places and 60-foot width in others. How this was established was not indicated by the testimony.
Establishing a center line does not establish the width of the road, except that common sense and experience indicate that normally the improvement to the road is equidistant on both sides of the center line (see Porter v. State of New York, 5 Misc 2d 28). The two engineers, and particularly Mr. Shumaker, set out to establish the width of the original road by the use of the aerial photo and mappings made from the original survey notes. One after another these were overlaid on one exhibit or other, and the matching was substantially correct — up to a 10-foot variation. But all these referred always to the center line, never the lateral width. To justify the lateral width, mappings were made of certain deeds which had reference in their description to the center line or the edge of the turnpike as a starting point. This, it was testified, is a very common method of describing farm lands.
State’s Exhibit UU shows the center line of the original turnpike as made up by Mr. Shumaker from the original survey notes. On this exhibit, to establish lateral distances, he imposed the description of the Zalon property whose boundary description commences at the center line of the turnpike. This property is not far from the claimants’ and is on the north side of 17B. By his own plotting, after he made actual field measurements, Mr. Shumaker brings the southerly boundary of the Zalon property 28 feet below the center line of the turnpike. Mr. Johnson did not indicate this disparity of 28 feet in State’s Exhibit BB, which was prepared by the court and upon which Mr. Johnson established the same Zalon property to start and end at the center line. Mr. Shumaker excused the variation in measurements by stating that the instruments used in olden days likely were responsible for this material variation in plotting, adding at the same time that the northerly stone wall of the Zalon property should have been plotted 28 feet back north of where it is at present, and suggesting further, that there may have been a relocation of the road in that area.
But on the same exhibit (State’s Exhibit UU) he shows another measurement taken from Great Lot Line No. 1 to the center line of Boute 17B. (He used for this the Pockrose deed.) The distance given in the deed from north to south, or along the turnpike road, is 2,845 feet. The actual field measurements are 2,835 feet or 10 feet difference.
*135 Another measurement along Hamilton Road taken from State’s Exhibit Z (Costello deed) is 2,854.5 feet. Actual field measurement is 2,869 feet or 14.5 feet difference.
Another distance taken from State’s Exhibit X (Wallace deed) recites a distance of 2,390 feet along Haley Road to the center line. Actual field measurements show 2,375 feet or 15 feet difference.
The last State’s Exhibit MM shows a deed distance of 2,904 feet along Sacket Lake Road to the center of the road. Actual field measurements indicate a distance of 2,945 feet or a difference of 41 feet.
All these field measurements were taken to substantiate the north-south position of the turnpike and to establish the claim of the State to be the owner of a 6-rod highway along the lands of these claimants.
The claimants owned a number of lots which were indicated on a subdivision map which was filed in the office of the County Clerk, and which were subdivided for members of the family. Along the northerly line of the 5 feet taken by the State according to its appropriation map, the claimants maintained a fence.
Stripped of all the difficulties of trying to understand ancient documents and surveys, overlays of maps, etc., the decision to be made is whether 17B, as it affects the subject property, is a 6-rod, a 4-rod or a 3-rod road.
In all good conscience the court cannot accept this aberration " of proof as establishing 17B as a 6-rod road along the property of the claimants. I cannot accept these marked variations in distances between deed descriptions and field surveys as a proof of the State’s claim, nor accept a ready explanation for each variation as a benefit to the State and a nullity of the claimants ’ contention.
The damages asked for and to be granted herein are small, indeed. The principle, however, is great. Is a property owner to be deprived of his rights just because the record is full of contradiction and uncertainties as to the validity of certain aspects of the many proceedings affecting this highway?
A turnpike is established by a statute with specific limitations, especially the width and length, and it must be interpreted very strictly as to those items (Schillawski v. State of Neiv York, 9 N Y 2d 235), for otherwise an owner could be deprived of his property without redress or recompense. The burden is entirely the State’s to prove beyond contradiction or uncertainty what its termini are and what its width is, and that it has not been relocated to the detriment of the claimants.
*136 In spite of the many contradictions, the court will hold that a lawful turnpike was originally established (Schillawski v. State of New Yorlc, supra). The court accepts the validity of the second turnpike company and its right to operate the portion of the original turnpike. I will concede that the State acquired lawful ownership of 17B as it was in 1911. The court has arrived at these conclusions principally on the authority of the Schillawshi case.
However, in that case the question whether or not the present road followed the original center line or not was not present. The court held there that the issue of whether the lands in question were within the boundaries of a pre-existing highway easement was adequately proven, even by the claimant’s own abstract of title. Such is not the case here. We are faced here with the State’s own maps and plans asserting a claim to only a three-rod road; the possibility of a relocation of the road; the equivocal mappings and measurements; the existence of a fence as an assertion of ownership by the claimants; the uncertainty of compliance with the requirements of the statute.
Thus, the court cannot accept the many and substantial variations as well as the very substantial differences in the measurements from adjoining northerly and southerly properties to the center line of the turnpike. This, to me, indicates that either there were errors in plotting the lateral lines of the turnpike or that arbitrary relocation of the road took place thereafter which affected the claimants’ property to an extent difficult to tell in view of the confused record.
Mr. Shumaker stated that he could not explain the 28 feet extension of the Zalon property below the center line and stated “ Well, it could be an error in plotting this South line on here when it was plotted.”
The State appears to have been completely indifferent to ttiip problem until these claimants asserted their claim in court. One can only speculate that in 1911, when it took over and reconstructed 17B the State was aware that 17B was only a three-rod road or maybe four rods. It should have had some knowledge regarding this roadway. Although no proof was adduced, it would seem fair to presume that the State must have made some investigation of the relationship of the roadway to the adjoining properties along its course.
It cannot be held here that the State acquired a prescription to a 6-rod road as prescribed in the statute, because it itself was unable to disprove the error in plotting or relocation of the road.
*137 The State has not maintained its burden of proving that a 6-rod road as laid out remained substantially where it was laid out.
The clearer proof indicates that the land of the claimants was outside of the turnpike right of way.
The findings to be signed herein will reflect this decision of the court.