Alexander Del Giorno, J.
The State of New York undertook to widen Route 17B between Monticello' and White Lake, in Sullivan County, for which construction plans were drawn in 1955.
The job has been completed and 17B is a fine road covered with asphalt.
To perform this work, additional land was required on both the north and south sides of 17B. The plans were drawn on the basis of the existing road being a three-rod road. The owners whose land was taken which lay outside of the three-rod road either filed claims or settled their claims. The State settled many claims on the basis of the road being three rods wide.
*467 However, at the trials of the claims which were not settled, the State asserted that in spite of the above plans it actually owned six rods of the Route 17B.
This issue had been tried by this court in the case of Frankfater v. State of New York (32 Misc 2d 130) which was chosen by the State as a test ease. At that trial it was established that by chapter 36 of the Laws of 1801, the Newburgh-Cochecton Turnpike was created by the Legislature. The law provided that the roadway was to be six rods within Sullivan County particularly west of Monticello, and four rods east of it. All the cases in issue are west of Monticello. During the Frankfater trial it further developed that sometime about 1865 the corporation failed, and that by virtue of chapter 262 of the Laws of 1838, the turnpike became a public highway in the Town of Thompson. Later, another Turnpike Corporation was created by law and took over the old turnpike between Monticello and White Lake. This failed, too; the road reverted to the town and, later, in 1911, was turned over to the State. The State took it over as a three-rod road, reconstructed portions of it in the thirties as a three-rod road, and, in 1955, completely renewed and widened it as a three-rod road.
At the Frankfater trial, it appeared that the Commissioners appointed pursuant to the Laws of 1801, took land and yet reported no damages due to many of the owners. The claimant, Frankfater, requested that this court find those actions unconstitutional because land apparently had been taken without compensation. This court refused to pass on the constitutional issue, stating that after the passage of time, it had to be presumed that the taking pursuant to the Laws of 1801 had conformed to the requirements of the law, namely, that compensation had somehow been made. This court advised the claimant then to raise the issue on appeal.
The other important issue raised in the Frankfater trial was that the layout of the roadway originally was not as it was in 1911 or 1955, that there had been wrong measurements of the width of the road, and that the center of the highway had not been originally as it was in 1955. An overlay was made by the State from the survey notes of the original turnpike, which fitted almost perfectly over the roadway as it existed in 1955. However, the State also offered certain deeds, the description of which ran to the center of the highway. These were offered to further confirm the location of the highway. However, the State’s own plottings indicated that one of these deeds ran its southerly boundary some 14 feet above the center *468 line while the other ran its southerly boundary some 28 feet below the center line. This court held, on the basis of the disparity of measurements of the deeds, that there was no way of determining at that subject location either the location of the center line or the boundaries of the highway, and that, therefore, as to Frankfater’s property, the road should be considered a three-rod road.
On appeal, this court was reversed by the Appellate Division (17 A D 2d 515), which held that the overlay was the overriding proof that the turnpike and the present 17B were the same road, that the owners were paid by the Commissioners, that use had been continuous as a. public highway, and that the old turnpike and 17B follow the same course, and for that reason it declared that the .State must prevail (Schillawski v. State of New York, 9 N Y 2d 235).
The present cases were the first of those remaining to be tried. At the end of the trial," the court made a statement, applicable to these cases as well as the others to follow, that it considered the decision of the Appellate Division that 17B was a six-rod road as the applicable law and binding upon this court, and would apply that determination of the Appellate Division all along 17B west of Monticello; and, further, that it would require all attorneys at the beginning of their trial to advise the court whether their land was within or without the boundaries of the six-rod highway. The court further ruled that where it appeared that there was no invasion of the land of any claimant on the basis of a six-rod road, it would dismiss such claim.
At this trial the claimants offered testimony to indicate that only two commissioners instead of three took their oath and acted pursuant to the Laws of 1801, and that, therefore, the establishment of the old turnpike was unconstitutional. The answer to this contention is simple. The Laws of 1801 provided that any two commissioners could make the inquisition, view the properties, etc. Two commissioners did.
These claimants, also, questioned the validity of the survey notes of 1805, and have approached from a different point of view than the Frankfater case the location of the center line of 17B. However, even more affirmatively than in the Frankfater case, the State in these cases not only has produced Mylar overlays made from the 1805 Survey Notes which fit perfectly over the 17B roadway as it was before the vesting date, but also Mylar overlays of the 1911 plans for reconstruction of 17B and the 1955 plans of reconstruction of 17B. These all *469 fitted the center line with minute variations and conform to the original center line also.
In addition to the above, the State produced for the first time survey notes it made of 17B in 1908 which established the very center line we have today.
On the basis of this cumulative convincing evidence, the State has now, even more affirmatively than it did in the Frankfater case established that the present center line is the center line of the original road, and this court so holds.
The court has been most meticulous in applying the many Mylar copies to the plans and determines that as to the “ Zalon ” property, Map 58, Parcel 39, there was no invasion of that property, on the basis of a six-rod road measured from the center line, and, therefore, said part of the claim is dismissed, and as to the Esther Manor property, Map 60, Parcel 41, Claim No. 35331, there was an invasion thereof on the most easterly end of the frontage. The State appropriated some 90 feet of frontage comprising some 500 square feet.
The State raised the road in front of Esther Manor from a more or less zero level at the entrance to Esther Manor land to a higher level eastward of about 7+ feet near Kenne Creek which is the easterly boundary line. By thus raising the road level the State created an embankment which holds back water during heavy storms, but has not otherwise affected the complete use of the land. Access in all cases to 17B has been preserved for the adjoining land.
The claimants asserted that the sewage disposal system was destroyed, some 20 spruce trees were cut down, and 1,300 feet of chestnut fence was demolished and the parking lot rendered useless. The claimants sustained direct as well as consequential damages and are entitled to remuneration as indicated below.
The court finds that Esther Manor and its complex of buildings were of the reasonable value before the vesting date of $450,000, allocating $50,000 to the land and $400,000 to the buildings and improvements on the land.
The court finds that the fair and reasonable value of the above after the vesting date was $444,700.
The court finds that the buildings were not affected but that the claimants were damaged in the sum of $5,300, allocating direct damages to the land of $300, and $5,000 for consequential damages, for the loss of fence, trees, damage to the sewage system and the effect of the embankment upon the remainder land.
*470 The claimants are entitled to judgment against the State in Claim No. 35331 in the sum of $5,300 with interest from September 13, 1956, to March 13, 1957, and from February 7, 1958, to the date of entry of Judgment.